86 N.J. Super. 308 (1965)
206 A.2d 779
STATE OF NEW JERSEY,
v.
MONROE ROBINSON, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided January 6, 1965.
*309 Mr. John J. Francis, Assistant Prosecutor of Essex County for the State (Mr. Brendan T. Byrne, Prosecutor, attorney).
Mr. Myron Mauer and Mr. Clive S. Cummis for defendant (Messers. Mauer & Mauer, attorneys; Mr. Cummis, of counsel).
*310 CAMARATA, J.C.C.
This is a motion by defendant Monroe Robinson to suppress certain evidence taken from a locker and an automobile.
The Essex County grand jury returned a three-count indictment charging defendant with larceny of silver of the value of $49,705.50 (first count), $2,348.70 (second count), and $1,997.93 (third count). The motion relates to evidence taken from a locker at the Engelhard Industries plant on New Jersey Railroad Avenue, Newark, New Jersey, and evidence taken from a 1963 Cadillac owned by defendant and parked in a public parking lot at a gas station. The evidence sought to be suppressed consists of pieces of silver, 8 in the locker at the plant and 11 in defendant's car. No search warrant had been issued or obtained.
From the testimony I find the essential facts to be as follows:
Defendant was for many years employed by American Platinum and Silver Division, a subsidiary of Engelhard Industries, in Newark, New Jersey. In November 1963 he was employed in the melting room.
There were three shifts operating in the melting room  respectively starting at 6 A.M., 7 A.M., and 8 A.M. The one starting at 8 A.M. ended at 4:30 P.M. At the close of the working day there were pieces of scrap, and on top of these would be placed pieces of silver some 5 or 6 inches long, 3 1/2 inches wide, and about 1 1/2 inches thick. In addition to defendant there was a helper in the melting room with him.
On one occasion it came to the attention of one of the employees that some of these cast-off pieces were missing, and he reported this to his immediate superior, Mr. Nordstrom. After this an employee for three days (November 4, 5, and 6, 1963) placed pieces of silver on the top of the scrap. When he left at 4:30 P.M. on those days the pieces were there. On November 5 they were there at 6 A.M. but missing at 8 A.M.; on November 6 they were there at 6 A.M. but gone at 7 A.M. He reported this to Nordstrom. Nordstrom, in turn, told him to discuss this with Mr. Crego, the plant manager.
*311 Crego had been plant superintendent for some ten years prior to the time in question. From his testimony it appears there were lockers at the plant assigned to the several employees. Their purpose was that employees could keep their working and street clothes there because all melters change their clothes. Each employee received a key, and the company kept a master key. While there was no written agreement with an employee when hired as to who was to have access to the locker, it was the superintendent's recollection that the man was told he would be given a locker and a key, however, he was not sure whether the employee was told that the company also had a key. He was firm in his statement that the union knew the company had a key to the lockers.
The plant superintendent related the information he had received from the other employees to Mr. Elmer Thomas, attorney for Engelhard Industries. Thomas authorized a Mr. James J. Cotter to make an investigation. Cotter is a licensed private detective who in November 1963 had been with the Engelhard Industries for some eight years. On November 6 Cotter went to the floor where the lockers were located and unlocked all of them except defendant's. He said he was looking for silver, as described to him, and saw none. He already knew that defendant was under suspicion, having been told so by Thomas.
On November 7, between 5 and 6 A.M., Cotter was on the roof adjoining the melting building with a pair of binoculars. It was raining hard, and he observed the melting room through the binoculars. There were windows, but his observations were not made through them. He had to make his observations through a vent slowly turning in the wind. He could see one man working. He didn't know his name at the time, but subsequently identified him as defendant. The distance from the roof to the building was some 40 feet. Through the binoculars he saw defendant light a big hose which he later found out started the furnaces. He then saw defendant go outside the furnace room door for a few minutes and come back. He had something shiny in his hand and put this object *312 in the top of his overalls. It was about five inches long, three or four inches wide; it looked like a piece of silver he had seen on other occasions. He knew that this was what he was looking for. Another man then came into the furnace room, and at that point Cotter left the roof and went to the plant.
Cotter then asked someone  not defendant  for a pass key to defendant's locker. In the company of Mr. Forsythe, a uniformed guard, he went to the locker floor. Defendant was not there at the time. Thereafter they observed defendant go to his own locker and open it. Defendant apparently noticed Cotter and Forsythe; he twice took his wallet out, locked his locker and left. Cotter did not observe anything in the locker at the time. He then opened the locker with the master key and found three pieces of silver, 5 inches long and 3 1/2 inches wide, in the pockets of the overalls. He saw five more pieces on the bottom of the locker. He then locked the locker, and he and Forsythe went to see Thomas. Cotter did not carry a gun during this interval.
Thomas learned from Cotter what had been found in the locker. He talked to defendant about it, with the result that defendant, Thomas and Crego went to the locker where Forsythe and Cotter were. When Cotter asked defendant to open the locker he said that he did not have a key and had not had one for some time  that he opened it without a key. But when defendant tried to open it by pulling the door, it did not open; and Cotter asked him, "If I get you a key, will you open the locker?" Defendant said something to the effect that he would.
Cotter then sent Forsythe for the master key. When he came back, Cotter handed the key to defendant, who opened his locker. Cotter told defendant to take everything out of the locker and put it on the table nearby, which he did. When defendant found the pieces of silver, he looked astonished and said he couldn't understand who had put them in his locker.
Defendant claims that Forsythe was in uniform all the time; that Forsythe told him to unlock the locker; that he *313 told Forsythe he had no key and had lost it; that Forsythe went to get the extra key; that when the defendant wouldn't unlock it, Forsythe said to him, "If you don't unlock it, we will go to headquarters and they will make you unlock it." Forsythe then gave him the key and he unlocked the locker.
When Thomas had questioned defendant, he also spoke to him about his car. Defendant denied that there was any silver in the car but said, according to Thomas, "You look at it if you want to." Both Cotter and Thomas say that when they all got to the gas station where the car was parked, defendant got the keys from an attendant, moved the car from a post, unlocked it, and together with Cotter pulled the silver pieces out. In the back of the car there was also a weighing machine which defendant said he used to weigh the silver so that when he sold it to somebody he wouldn't be "gypped." There were 11 pieces of silver in the back of the car. While he was observing what was in the back of the car, Cotter saw a locked green box  a tool box. Defendant took one of a bunch of keys and opened it up. In it was a brown paper bag containing some money. Defendant told Cotter that the money came from the silver he had sold. Cotter asked him if it was Engelhard's money, and defendant said yes. He heard the defendant say that the currency was from the sale of the stolen silver.
It was company attorney Thomas' opinion that everything defendant said and did was voluntary. He testified that defendant had said he didn't know why he had done it.
Defendant denies he said anything about the car, except that he knew there was something in it. He testified he did not open the car right away, and again was told that headquarters was across the street; that if he didn't open the car, they would take him there and make him give up the key. He admitted having a key to the locker and that he had looked into the locker a little earlier, prior to the time Cotter opened the locker with his own key.
Cotter denies that he promised defendant anything at any time before the trunk was opened; and states that no one touched or threatened defendant, or in any way forced him to open the locker or the trunk of the car. Cotter admitted that *314 he called no enforcement agency. He stated that no search warrant was obtained because everything was done so quickly, and that if there was one to be obtained, it was up to the company's legal department.
Thomas corroborated Cotter's testimony. He, too, denies that he ever threatened defendant, promised him anything or coerced him; he told defendant that the silver was missing and asked him to help solve the problem, even though he knew when he was questioning the defendant what Cotter had found in the locker  meaning the silver in the overalls and the silver at the bottom of the locker. This was before they went back the second time to open the locker.
On questioning by the court as to why he didn't get a search warrant for the car, Thomas explained that defendant was willing to go to the car; that he thought defendant was trying to clear himself of having taken anything from the plant; that no search warrant was obtained for the locker because all he wanted to do was to locate and retrieve the property  the silver belonged to the company.
I believe the witnesses offered by the State were truthful and forthright. Not so with the defendant; I do not believe he told the truth.
There was produced before me a card identifying the detective and on the back was the wording required by N.J.S.A. 45:19-17. N.J.S.A. 45:19-8 through 27 are known as the Private Detective Act of 1939. N.J.S.A. 45:19-9(b) and (c), part of the definitions section, reads as follows:
"(b) The terms `the business of detective agency,' `the business of investigator' and `the business of watch, guard or patrol agency' shall mean any person, firm, association or corporation engaged in the private detective business as defined in subsection (a) of this section, who employs one or more persons in conducting such business.
(c) The terms `private detective' or `investigator' shall mean and include any person who singly and for his own account and profit conducts a private detective business without the aid or assistance of any employees or associates."
First, as to the status of Cotter and Forsythe I conclude that:
*315 (a) There was no evidence that Cotter or Forsythe was directly or indirectly connected with any local, county, state or federal law enforcement agency or government agency.
(b) Cotter was hired by the Engelhard Industries as a private investigator or private detective.
(c) Forsythe was employed by Engelhard Industries as a uniformed security guard.
Defendant contends that under the Federal and State Constitutions he is entitled to protection against an unreasonable search and seizure of the evidence taken from the locker and his car.

I.

(AS TO THE LOCKER)
I conclude that even though defendant had a key to the locker, the company also had a right to enter the locker because:
1. It was the company's property.
2. In the contract between the company and the union. of which defendant is a member, it was provided that the company retained a master key to the locker.
Defendant has no standing to object to the use of the evidence taken from the locker and to obtain its suppression merely because he was lawfully on the premises. In State v. Bibbo, 83 N.J. Super. 36 (App. Div. 1964), the court said:
"* * * One has no standing to object if the seizure has not invaded a `right of privacy of person or premises' which belongs to him personally or by extension  a right which Maguire, supra, describes as `proprietary, possessory or participatory.'" (at p. 39)
Assuming defendant had a standing as to the locker, the question to be considered is  does the exclusionary rule as enunciated in the landmark case of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), apply?
The U.S. Supreme Court, in Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), discussed evidence seized by other than police officers and held:
*316 "The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; * * *
In the present case the record clearly shows that no official of the federal government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him and was in the possession of the Cities Service Company. It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another. A portion of the property so taken and held was turned over to the prosecuting officers of the federal government. * * *" (at p. 475, 41 S.Ct., at p. 576; emphasis added)
Burdeau has not been overruled by Elkin v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684 (1961), or other cases. It was followed in United States v. Goldberg, 330 F.2d 30 (3 Cir. 1964), certiorari denied 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964), where the court said:
"We think the documents and records were clearly admissible under Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048. Here, certain of McDowell's business associates had taken from his safe, without his knowledge, certain documents and had turned them over to Government officials. * * * Here, the evidence established that no Government official had participated in or had been connected with the taking and that since the documents came into their possession without a violation of McDowell's rights by any Government authority the Government could retain them and use them as evidence." (330 F.2d, at p. 35)
In People v. Trimarco, 41 Misc.2d 775, 245 N.Y.S.2d 795 (Sup. Ct. 1963), defendant sought to suppress evidence alleged to have been obtained as a result of an unlawful search and seizure. The facts there were that defendant was forceably removed from an airplane by alleged security officers of the airport or airline, taken to a room where he was searched, and certain documents removed from his person. The security officer was an investigator for the airline and was not a *317 governmental officer or official. In denying defendant's motion the court relied upon Burdeau, supra, and cited People v. Randazzo, 220 Cal. App.2d 768, 34 Cal. Rptr. 65 (Ct. App. 1963), certiorari denied 377 U.S. 1000, 84 S.Ct. 1933, 12 L.Ed.2d 1050 (1964). In Randazzo the court examined both the federal and other state rulings wherein Burdeau had been cited, and concluded that Burdeau had not been overruled.
There is no New Jersey case similar to the instant one. However, the applicability of Burdeau was discussed in State v. Scrotsky, 39 N.J. 410 (1963). In that case the landlady went with the police officer to the apartment rented to the tenant. The State relied on Burdeau, but the Supreme Court held that case inapplicable under the facts, since the search and seizure resulted from unlawful concert of action on the part of the landlady and the police officers. It is to be noted that the court did not disagree with the contention of the State that:
"Consequently, where a private person steals or unlawfully takes possession of property from the premises of the owner and turns it over to the government, which did not participate in the taking, it may be used as incriminating evidence against the owner in a subsequent criminal prosecution." (at p. 416)
The decisions in Mapp v. Ohio and Burdeau were considered in the recent case of Sackler v. Sackler, 33 Misc.2d 600, 224 N.Y.S.2d 790 (Sup. Ct. 1962), reversed 16 A.D.2d 423, 229 N.Y.S.2d 61 (App. Div. 1962), affirmed 15 N.Y.2d 40, 255 N.Y.S.2d 83, 203 N.E.2d 481 (Ct. App. 1964). This case involved a civil action for divorce in which defendant's wife sought to suppress certain evidence of adultery obtained by her husband as a result of entry into her separately maintained apartment. The court held:
"* * * The Supreme Court's decision of 1961 in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 applying the Fourth Amendment is of course not controlling here or even applicable since its impact is on governmental seizures only and not on evidence illegally gathered by private persons. * * * See historical material in Boyd v. United States, 116 U.S. 616, 624-630, 6 S.Ct. 524, 29 L.Ed. *318 746 (1886). Never were those protections applicable to searches and seizures by any persons other than government officers and agents. Searches by `the government' only are covered, that is, `official acts and proceedings' and `invasions on the part of the government and its employees of the sanctity of a man's home and the privacy of life' (Boyd opinion, supra, pp. 623, 624, 630, 6 S.Ct., p. 532) * * *"
"* * * Neither history, logic nor law give any support for the idea that uniform treatment should be given to governmental and private searches, and to the evidence disclosed by such searches. * * *" (Emphasis added)
The foregoing cases cite and follow Burdeau.
I conclude that the exclusionary rule does not apply to the circumstances here and that Burdeau is applicable.
An employer has a right which it can lawfully exercise, as in the instant case, to obtain the return of its own materials, the silver pieces. Not to permit an employer to do so places him at the mercy of his employees. This should not, and cannot be permitted.
In the Randazzo case, supra, defendant was prosecuted for shoplifting. She had taken merchandise from the store and placed it in her purse while in the dressing room of the store where observation was made by a store detective not connected in any way with a state law enforcing agency. The court held the evidence admissible and not a denial of due process within the Fourteenth Amendment. It said:
"To hold that evidence obtained as it was in this case by employees of the store is not admissible in a trial of the defendant for her theft is in effect to give shoplifters a `license to steal' and places responsible business concerns virtually at their mercy. It would add untold millions to the already heavy losses that merchants throughout the country sustain annually from the prevalence of this nefarious practice. We cannot approve a procedure which makes such a result possible, absent statutory or other clear and specific authority. No such authority has been presented, and our own research has not produced any." (34 Cal. Rptr., at p. 70; emphasis added)

II.

(AS TO THE CAR)
Next to be considered is whether my conclusions as to the exclusionary rule relating to the silver taken from defendant's *319 locker apply equally to the silver and money taken from his car, located in the parking lot and not on Engelhard Industries property. I have concluded that they do and that the exclusionary rule does not apply.
While the fact that defendant was the owner of a car which was not on company property gives him the right to bring the within motion, State v. Bibbo, 83 N.J. Super. 36 (App. Div. 1964), nevertheless what took place as to the car was part of a chain of events and caused by defendant's actions in taking the pieces of silver, the property of his employer. Additionally, he opened the trunk and smaller box with his own key. This he did freely and voluntarily.
Defendant's motion to suppress the evidence taken from the locker and the car is denied. His attorney will submit an appropriate order, consented to as to form by the prosecutor.