**UNITED STATES of America,
Appellee,**

v.

**John A. McGUIRE, Edmond G. Blumner
and Herbert Perry, Appellants.**

**No. 402, Docket 30369.**

United States Court of Appeals
Second Circuit.

Argued May 3, 1967, and May 11, 1967.

Decided July 20, 1967.

Roger J. Hawke, Robert G. Morvillo, Paul R. Grand, Michael W. Mitchell, Asst. U. S. Attys., Robert M. Morgenthau, U. S. Atty., for appellee.

Eugene P. Souther, Anthony R. Shalit, New York City, for McGuire.

Myles V. Whalen, Jr., John J. Madden, Jr., Werner L. Polak, Anthony F. Marra, New York City, for Blumner.

Jerome J. Londin, Robert C. Rosenberg, Carro, Spanbock & Londin, New York City, for Perry.

Before WATERMAN, FRIENDLY and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge.

McGuire, Blumner and Perry appeal from judgments of conviction entered against them in the United States District Court for the Southern District of New York after a trial without jury. The indictment against appellants contains 12 counts. Count one charges that the three appellants conspired with certain other individuals to violate the federal securities laws by impeding the lawful governmental function of the Securities and Exchange Commission by selling unregistered securities in interstate commerce and by utilizing fraudulent practices in the sale of these securities. Counts two through eight charge all the appellants with using the mails for specific sales of unregistered stock in violation of 15 U.S.C. §§ 77e(a) (1), 77x; 18 U.S.C. § 2. Counts nine through twelve charge appellant Perry with selling securities in interstate commerce by fraudulent means in violation of 15 U.S.C. §§ 77q(a), 77x.

After the Government's case was presented, counts five and eight were dismissed by the court with the consent of the Government. At the end of the trial the court found all the appellants guilty on counts 1, 2, 3, 4, 6 and 7. Appellant Perry also was found guilty on counts 9 and 10, but was acquitted on counts 11 and 12. McGuire was sentenced to three years imprisonment and to a $1,000 fine on each of the six counts upon which he was convicted, the prison sentences

to run concurrently. Blumner was sentenced to concurrent two year prison terms on the same six counts, the counts on which he was convicted, and Perry was sentenced to concurrent one year terms on the eight counts on which he was convicted. The opinion of the trial court appears at 249 F.Supp. 43 (USDCSDNY 1965).

The evidence presented by the Government showed that the conspiracy among the appellants was conceived by appellant McGuire in late 1957. McGuire, who held oil and gas leases on 300,000 to 500,000 acres of land in Northern Ohio, needed cash to pay the annual rental on the leases covering this acreage and to finance wildcat drilling on the land to establish its value. On November 1 and 2, 1957 McGuire met with Blumner, Perry and others in McGuire's office in Erie, Pennsylvania, to discuss methods of raising the necessary money. Blumner suggested that McGuire put the leases into one corporation and secure full registration of the corporation's securities, but McGuire rejected this proposal when he was informed that a full registration would take six months. McGuire then proposed that the needed capital be raised by selling the securities of a series of small corporations which would be small enough to be exempt from full registration under Securities and Exchange Commission Regulation A [1] because the con-

---

1. Regulation A insofar as pertinent here is found in 17 C.F.R. §§ 230.251 et seq.

The Securities Act of 1933 provides:

§ 77e. Prohibitions relating to interstate commerce and the mails

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. 15 U.S.C. § 77e(a).

An exception to this requirement of registration is provided by 15 U.S.C. § 77c(b) which allows the Securities and Exchange Commission to make regulations exempting from full registration issues of securities where the aggregate amount offered to the public does not exceed $300,000. Under this authority the Commission has promulgated Regulation A.

Regulation A contains numerous Rules. The pertinent ones are:

Rule 251. *Definitions of Terms Used in this Regulation.*

As used in this regulation, the following terms shall have the meaning indicated:

*Affiliate.* An "affiliate" of an issuer is a person controlling, controlled by or under common control with such issuer. An individual who controls an issuer is also an affiliate of such issuer.

Rule 252. *Securities Exempted.*

(a) Except as hereinafter provided in this regulation, securities issued by any of the following persons shall be exempt from registration under the Act if offered in accordance with the terms and conditions of this regulation:

(1) Any corporation, unincorporated association or trust (i) which is incorporated or organized under the laws of the United States or Canada or any State or Province thereof and (ii) which has or proposes to have its principal business operations in the United States or Canada * * *.

Rule 254. *Amount of Securities Exempted.*

(a) The aggregate offering price of all of the following securities of (i) the issuer, (ii) its predecessors and (iii) all of its affiliates which were incorporated or organized, or became affiliates of the issuer, within the past two years, shall not exceed $300,000:

(1) all securities of such persons presently being offered under this regulation, or under any other regulation adopted pursuant to Section 3(b) of the Act, or specified in the notification required by Rule 255 as proposed to be so offered;

(2) all securities of such persons previously sold pursuant to an offering under this regulation, or under any other regulation adopted pursuant to Section 3(b) of the Act, commenced within one year prior to the commencement of the proposed offering; and

(3) all securities of such persons sold in violation of Section 5(a) of the Act within one year prior to the com-

spirators could "grind these small registrations out in thirty days."

■■ The conspirators agreed to this plan and proceeded to work out some of the details. McGuire was to control the various corporations so to be formed by controlling their corporate officers who were to be his relatives and employees who had good reputations and who would be amenable to his direction of the affairs of their corporations. McGuire was to furnish oil and gas leases and cash to the officers so that they could contribute to the corporations and obtain stock. Blumner, an attorney, was to undertake the legal work necessary to organize the various corporations and to file the required notifications with the SEC for the Regulation A security offerings. Perry would participate in the sale of the securities of the various corporations to the public.

The proposed plan was swiftly put into operation. On November 22, 1957 three Delaware corporations were organized by appellants. They were originally named Asta-King Petroleum, Inc. (Asta-King), Conneaut-King Petroleum, Inc., and Erie-King Petroleum, Inc., but the names of the latter two were changed to Tamarac Gas and Oil Company, Inc. (Tamarac), and The Haratine Gas and Oil Company, Inc. (Haratine) respectively. The officers of the three corporations were selected by McGuire, but it is clear that all important corporate decisions were made not by them, but by appellants, none of whom were designated as corporate officers; and it is also clear that the nominal corporate officers not only did not participate in these decisions but often were totally unaware that they had been made. The oil and gas leases

and the cash contributed to the corporations by their officers were furnished by McGuire. Large blocks of each company's stock were issued to its officers in exchange for their "contributions" to the corporations, the officers in turn each gave McGuire options to purchase large portions of their stockholdings in the companies.

On January 8, 1958 Asta-King's notification of a Regulation A issue of securities was filed by Blumner. The offering circular filed with the notification contained significantly false statements about the company, particularly because it failed to show that the company was controlled by appellants, not its officers. The Asta-King offering began on January 23, 1958 and was completed on April 8, 1958, with the sale of 222,200 shares of its stock to the public for $299,970. Perry was employed as a salesman of the underwriter of the issue and personally sold at least part of the issue over the telephone in "boilerroom" fashion.

On May 16, 1958, shortly after the completion of the Asta-King offering, Blumner mailed notification to the SEC that Tamarac would be offering a Regulation A issue of stock to the public. Again the notification was accompanied by an offering circular which contained no mention of the fact that McGuire controlled the company. The Tamarac offering began on June 5, 1958 and was completed on July 29, 1958 when the entire offering of 266,640 shares had been sold to the public for $299,970.

The Haratine offering followed closely after the Tamarac offering. Notification was filed with the SEC on June 23, 1958, with an offering circular which gave no indication that McGuire con-

---

mencement of the proposed offering. 17 C.F.R. §§ 230.251, 230.252, 230.254. The effect of this regulation is to exempt from full registration all issues which do not exceed $300,000 unless the $300,000 is exceeded when added to issues of an "affiliate"; the total amount issued by all affiliates may not exceed $300,000 if any of the issues of any affiliate is to qualify for the exemption.

It can readily be seen that Regulation A does not allow separate exemptions to the issues of two or more corporations controlled by the same person or persons because within the meaning of Rule 251 those persons would be "affiliates" of each corporation which they control. Under Rule 254 the total amount of all issues offered to the public by all of the controlled corporations cannot properly exceed $300,000.

trolled Haratine or that the company was in any way connected with Asta-King or Tamarac. At this point the SEC became suspicious of a possible connection between the three companies and a series of communications between John Mayer of the SEC and Blumner commenced. Blumner ended the inquiry at this time by a letter dated July 29, 1958 in which he falsely stated that the companies were independent of each other and that there were no understandings between the "director-officer-promoters" of any of the companies. Blumner did not mention McGuire's name in the letter although McGuire was in actual control of all three companies.

The sale of the Haratine stock was commenced on August 5, 1958, and continued until October 29, 1958 when approximately 67,000 shares of the issue had been sold to the public at $1.50 a share for a total of $100,500. The various substantive counts in the indictment relate to sales of Haratine stock made during this period, which sales we set forth in the margin.[2] The trial court found that Perry made these five sales and that in making the sales set forth in count 2 to Riley and in count 3 to

Lauro he made material misrepresentations (counts 9 and 10).[3]

On October 29, 1958 the SEC temporarily suspended Haratine's Regulation A exemption under Regulation A, Rule 261, 17 C.F.R. § 230.261, on the ground that the company had failed to file certain promotional material with the SEC as required by Regulation A, Rule 258, 17 C.F.R. § 230.258, and that the material which had been filed contained false statements and omitted material facts. The false statements and omissions involved were not based on the control by appellants of the three companies, a fact not yet discovered by the SEC at the time of the suspension, and are not relevant here. The suspension was made final on May 21, 1959 pursuant to a stipulation among the interested parties.

The evidence also reveals other activities of appellants. McGuire proceeded systematically to loot the three companies of the funds obtained from the public offerings by exchanging these funds for practically worthless paper such as participations in the drilling of oil wells which already had proved to be dry holes. It is not clear whether Blumner and Per-

2. The individual sales involved were:

| Count | Purchaser | Confirmation Date | Shares of Haratine Purchased |
|---|---|---|---|
| 2 | Mabel G. Riley | Sept. 2, 1958 | 200 |
| 3 | William Lauro | Sept. 3, 1958 | 1100 |
| 4 | Frederick Flatto | Sept. 4, 1958 | 1000 |
| 6 | William Lauro | Oct. 9, 1958 | 200 |
| 7 | Joseph Weissenbach | Oct. 9, 1958 | 1400 |

3. The trial court found as to count 9 that Perry had represented to Mabel G. Riley, knowing the statements to be false:

1. that in August and September 1958 Haratine had an oil producing well;

2. that it was a good strong company;

3. that purchasers would soon double and triple their money;

4. that the Lieutenant Governor of Pennsylvania had invested money in Haratine; and

5. that the stock of Haratine was "selling like wildfire."

It was found as to count 10 that Perry had made the following statements to William Lauro, knowing the statements to be false:

1. that the stock of Haratine was going to be worth $3 per share;

2. that the market price of the stock was going to be at least $3 per share;

3. that the Haratine management "were responsible people"; and

4. that Haratine had good positions in the oil fields.

ry were aware of this looting, but this is unimportant here because this activity of McGuire is not a necessary element of any of the crimes for which appellants have been convicted.

Appellants also established a broker-dealer corporation, Herbert Perry & Co., Inc., which was charged with being a co-conspirator of appellants in the indictment in this case. The company was established to avoid paying underwriting fees to outsiders on the conspirators' Regulation A stock offerings and acted as underwriter of the Haratine issue. As with Asta-King, Tamarac, and Haratine, Herbert Perry & Co., Inc. was actually owned and controlled by McGuire although his name nowhere appeared in its incorporation papers or in the application to the SEC for registration as a broker-dealer.

Finally, it appears that appellants contemplated a fourth corporation styled CEDCO Electronics Co. which was also to make a public offering under a Regulation A exemption. The Regulation A notification and the now familiar false offering circular were filed by appellants with the SEC on October 16, 1958, but appellants' efforts did not reach fruition. The notification was withdrawn on November 13, 1958 following the Haratine suspension on October 29, 1958.

I. *Admissibility of Recordings of Telephone Conversations Between the Various Conspirators.*

The Government's case consisted in part of evidence secured from dictaphone recordings made by McGuire of his telephone conversations with the other conspirators. The contents of nine of these recording discs were introduced into evidence by the Government at the trial over defendants' objections that the discs were illegally acquired evidence.

The Government had in its possession at the time of the trial 87 of McGuire's recording discs. It is undisputed that 43 of these had been voluntarily turned over to the Government by McGuire. Exactly how the Government obtained possession of the remaining 44 discs, among which were eight of the nine discs introduced in evidence at the trial, is disputed. McGuire testified that he left these discs in the home of his sister, and that someone, probably his brother-in-law, William Wolfe, stole them and turned them over to the Government.[4] McGuire does not contend that the Government was a party to the alleged theft but only that it asked for the discs after the theft and that they were then handed over. The Government's version of this incident, based on the testimony of an SEC attorney, is that McGuire voluntarily surrendered all 87 discs, 9 on April 19, 1963, and 78 on April 22. McGuire claims that he handed over 43 discs on April 19 and none on April 22. It does appear that the recordings, no matter how obtained, were used both for investigative purposes and as evidence against the conspirators at trial.

The court below did not make a specific finding that the discs in question were stolen from McGuire or one that they were voluntarily turned over to the Government by him. It admitted the recordings into evidence because "assuming that Wolfe stole the records and Wolfe has got the records and the government goes to Wolfe and says, 'Will you give us the stolen records,' I don't see anything violative of anybody's constitutional rights in that." This ruling was proper under the rule of Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Nevertheless, ap-

---

4. It is also claimed that Wolfe stole and turned over to the Government 4 or 5 cartons of business records of Perry & Company and books and records of McGuire. While none of these documents were used at the trial, appellants contend that the records led to the discovery of some checks which were received in evidence. However, the prosecutor asserted at trial that the checks were subpoenaed before the Government learned of the existence of the stolen records, and the defense did not attempt to refute this assertion.

pellants urge us to overturn the ruling in the face of the direct Supreme Court precedent. We do not find it necessary to reach this issue,[5] however, because it

5. If the trial court had found that the recordings had been stolen we would be constrained to affirm its adherence to the Supreme Court's ruling in Burdeau v. McDowell, supra. The Supreme Court has not been faced with the issue since that case, and we do not find grounds to challenge the continued validity of the rule. Appellants would have us do so for they claim that the Court's rejection of the "silver platter" doctrine in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) and the holding in Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956) must be construed to include the Burdeau situation in which the seizure is made by private persons as well as to include those situations in which the seizure was made by officials acting under the authority of a sovereign other than the sovereign which desires to use the seized material. But the opinions of the Court in Elkins and Rea offer no support for this view; they do not even cite Burdeau. The only support for appellants' position is the clear dictum of the Sixth Circuit in Williams v. United States, 282 F.2d 940, 941 (1960) and an opinion by a state court in a domestic relations case, Del Presto v. Del Presto, 92 N.J.Super. 305, 223 A.2d 217 (1966). The weight of authority is that Burdeau's holding was unimpaired by Elkins and Rea, United States v. Goldberg, 330 F.2d 30 (3 Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); United States v. Frank, 225 F. Supp. 573 (D.D.C.1964), aff'd in part, rev'd in part, 120 U.S.App.D.C. 392, 347 F.2d 486, petition for cert. dismissed, 382 U.S. 923, 86 S.Ct. 317, 15 L.Ed.2d 338 (1965); People v. Randazzo, 220 Cal. App.2d 768, 34 Cal.Rptr. 65 (Dist.Ct. App.1963), cert. denied, 377 U.S. 1000, 84 S.Ct. 1933, 12 L.Ed.2d 1050 (1964); Wright v. United States, 224 A.2d 475 (D.C.Mun.App.1966); Moody v. United States, 163 A.2d 337 (D.C.Mun.App. 1960); State v. Robinson, 86 N.J.Super. 308, 206 A.2d 779 (1965).

Appellants mainly base their claim on the proposition that the Fourth Amendment forbids illegal searches and seizures by private persons as well as officials of the state. They start with the proposition that one's protection from official searches and seizures was an extension of the reach of the action of trespass so as to cover public officials as well as private persons. See Entick v. Carrington, 19 How.St.Tr. 1029 (C.P. 1765). This may

well be true but it does not follow that the converse, one's protection from official unreasonable searches and seizures in the Fourth Amendment, covers or was intended to cover trespasses by private persons. The thrust of the Fourth Amendment is to assure protection from official, not private, intrusion. See Hoffa v. United States, 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Nor is the Brandeis-Holmes dissent in Burdeau, upon which appellants rely heavily, based on the proposition that use by the Government of privately seized evidence violates the Fourth Amendment. This is clear from Mr. Justice Brandeis's language that "I cannot believe that action of a public official is necessarily lawful, because it does not violate constitutional prohibitions * * *." 256 U.S. at 477, 41 S.Ct. at 576.

Appellants also argue that the Fourth Amendment applies to searches by private persons because the first draft of the provision by James Madison was of limited scope protecting only against unreasonable searches by use of a general search warrant or writ of assistance, see Annals of Cong., 1st Cong., 1st Sess. at 434–35, while the Fourth Amendment as finally adopted protects against all unreasonable searches and seizures. It is true that the first version which prohibited unreasonable searches by warrant more pointedly refers to searches by officials; private persons ordinarily would not conduct their searches pursuant to warrants. While it is conceivable that the draftsmen of the final version intended it to include unreasonable searches by private individuals as well as by public officials, we are unconvinced that the Amendment should be interpreted in this manner. We adhere to the equally reasonable and commonly understood interpretation that it applies to all unreasonable searches by public officials, with or without warrants, but not to searches by private persons.

Were the Supreme Court faced with the situation in Burdeau again, it might heed Mr. Justice Brandeis's admonition that "Respect for law will not be advanced by resort, in its enforcement, to means which shock the common man's sense of decency and fair play." 256 U.S. at 477, 41 S.Ct. at 576; see Black, Burdeau v. McDowall [sic]—A Judicial Milepost on the Road to Absolutism, 12 B.U.L.Rev. 32, 37 (1932). The Court could declare evidence stolen by private persons and handed over to the Govern-

is clear that the court believed that the recordings were not stolen but were turned over voluntarily to the Government by McGuire. As we have stated, the trial court did not specifically make a finding on how the Government obtained possession of the recordings, but it did state generally as to its resolution of contradictory testimony:

> The Court finds that the testimony of defendants McGuire and Blumner is in material respects not worthy of belief; to the extent that their testimony is in conflict with testimony offered by the government, their testimony is rejected and the testimony offered by the government is accepted. 249 F.Supp. at 44.

This statement applied to the conflict between, on the one hand, uncorroborated testimony of McGuire and, on the other, the uncorroborated testimony of an SEC attorney for the Government. The trial court credited the Government's version of the story that the discs were voluntarily turned over to the Government by McGuire.

■■ Appellants also claim that the disc recordings were inadmissible because their receipt in evidence violated Section 605 of the Federal Communications Act, 47 U.S.C. § 605.[6] They first urge that interception of a telephone conversation by one of the parties to the conversation is a violation of the Act even though this position has been rejected by the Supreme Court in *Rathbun v. United States*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957). Appellants would restrict the *Rathbun* holding to situations in which the interception is made over a regular telephone extension although it has been uniformly held to apply to consensual interceptions by various types of recording devices. E. g., *United States v. Ballou*, 348 F.2d 467 (2 Cir. 1965); *Carnes v. United States*, 295 F.2d 598 (5 Cir. 1961), cert. denied, 369 U.S. 861, 82 S.Ct. 949, 8 L.Ed.2d 19 (1962), decisions with which we agree.

■ Alternatively, appellants urge that use of these recordings violates Section 605 because that statute provides that not only the interception but the

---

ment inadmissible in the federal courts in criminal trials in an exercise of the Court's supervisory power, see *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), but, in the absence of such a pronouncement, we of course are bound by the rule in *Burdeau*.

6. 47 U.S.C. § 605 reads as follows:

§ 605. Unauthorized publication or use of communications

No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpoena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided,* That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress.

divulgence of an intercepted conversation requires the consent of one of the parties to the conversation. The relevant part of Section 605 reads:

> * * * no person not being authorized by the sender shall intercept any communication and divulge or publish the * * * contents * * * of such intercepted communication to any person; * * * and no person having received such intercepted communication * * * shall divulge or publish the * * * contents * * * of any part thereof * * *.

Though it appears from this language that it is well arguable that the statute prohibits unauthorized divulgence of "intercepted communication[s]" see United States v. Zarkin, 250 F.Supp. 728, 735 (D.D.C.1966), it would not literally seem to prohibit unauthorized divulgence of a communication which was intercepted by or with the consent of one of the parties to the communication; this therefore would not be an "intercepted communication" within the meaning of the statute. Moreover, as we have concluded that the court below found that the records were voluntarily turned over to the Government by McGuire, there was also no prohibited divulgence. Section 605 surely does not mean that a party to a telephone conversation may not disclose it, or a recording of it, to another or that the other may not use it if he does.

 Appellants' final ground for exclusion of the disc recordings is that they were made in violation of Pennsylvania state law. It is claimed that the Pennsylvania statute, 15 Pa.Stat. § 2443,[7] prohibits interception of a telephone conversation unless the interception is made with the consent of both parties to the conversation, citing Commonwealth v. Murray, 423 Pa. 37, 223

A.2d 102 (1966). But this case has been distinguished in a later Pennsylvania case, Commonwealth v. Goldberg, 208 Pa. Super. 513, 224 A.2d 91 (1966), on the ground that the *Murray* case did not involve the interception by a subscriber on his own line. The *Goldberg* court held that a subscriber had a "paramount right" to make interceptions on his own telephone line. McGuire's interception in this case would seem to come within the *Goldberg* rather than the *Murray* rule, but we need not determine this point for, even if a violation of Pennsylvania law were involved, it would appear that this fact would not render the recordings inadmissible in a federal criminal trial. Olmstead v. United States, 277 U.S. 438, 468–469, 48 S.Ct. 564, 72 L.Ed. 944 (1928); Ferguson v. United States, 307 F.2d 787 (10 Cir. 1962), opinion withdrawn and new trial ordered on other grounds, 329 F.2d 923 (10 Cir. 1964); cf. United States v. Pardo-Bolland, 348 F.2d 316, 322–323 (2 Cir.), cert. denied, 382 U.S. 944, 86 S.Ct. 388, 15 L.Ed.2d 353 (1965).

II. *Sufficiency of the Evidence as to Blumner and Perry.*

 Blumner and Perry claim that the evidence presented at trial was insufficient to support their convictions. In examining these claims we view the evidence presented to the trial court in the light most favorable to the Government, allowing for all inferences which the trial judge as trier of fact might permissibly have drawn in the Government's favor. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Kahaner, 317 F.2d 459 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963). Nor will we reexamine the assessment of the trier of fact as to the credibility of the witnesses who testified before him.

---

7. The Pennsylvania statute, the Act of July 16, 1957, P.L. 956, 15 P.S. § 2443, reads in pertinent part as follows:
 No person shall intercept a communication by telephone or telegraph without permission of the parties to such communication. No person shall install or employ any device for overhearing or recording communications passing through a telephone or telegraph line with intent to intercept a communication in violation of this act. No person shall divulge or use the contents or purport of a communication intercepted in violation of this act.

Blumner claims that the evidence adduced at the trial against him is insufficient to support his conviction on the conspiracy count. Specifically, he claims that the government evidence was insufficient to prove that he knew that McGuire controlled Asta-King, Tamarac, and Haratine, an essential element of the conspiracy offense. Blumner maintains that in fact he had no knowledge that McGuire controlled the three companies and that the evidence in the case is consistent with the possibility that McGuire was acting merely as a "coordinator" for the various promoters of the companies. The trial court totally rejected this possibility. It found that Blumner "knowingly and willfully entered into a criminal partnership with McGuire, and assisted its plans in every way [he] could." 249 F.Supp. at 45. A general review of the evidence indicates that it is almost impossible that Blumner could be as extensively involved in the McGuire operation as he was shown to have been without being aware that McGuire controlled the companies. But even without this, the testimony of government witnesses Brandes[8] and Weissenbach[9] is sufficient to support the trial court's finding that Blumner was well aware of McGuire's control of Asta-King, Tamarac, and Haratine.

Perry claims that the government evidence was insufficient to show that he knew that McGuire controlled the three companies, or that he knew that the combined offerings of the three companies exceeded $300,000, or that he knew to be false the various statements which he made to his customers to induce them to buy stock of Asta-King and Haratine.

8. Brandes testified as to discussions at the meetings held on November 1 and 2, 1957 at which he was present with McGuire, Blumner and Perry:

Mr. Blumner started asking Mr. McGuire how he planned to proceed along the lines of setting up a filing with the SEC, just how he would proceed to do it. Mr. McGuire said he had many thousands of acres of leases in southern and northern Ohio; that he would put these leases into various corporations; he would have these corporations officered.

And then Mr. Blumner interrupted and said, "I understand, Mr. McGuire, that you have some overriding royalties that are producing oil right now." And Mr. McGuire agreed that he had.

And Mr. Blumner said, "Why don't you put these in and make a full registration and at least you will have production and it will look much better in the prospectus and be easier to sell." Mr. McGuire said, "Mr. Blumner, how long will that take?"

And he said, "Six months." And he said, "I'm not interested in anything that would take six months. I can grind these small registrations out in thirty days."

\* \* \* \* \*

Mr. McGuire, naturally, got into the ramifications of the setting up of these Regulation As, the technical parts of it, how to set them up, how the acreage was to be put in by Mr. McGuire into these various Regulations As, and he left it in no uncertain terms that whoever was in these corporations, he controlled these corporations, he would tell anybody what to do.

\* \* \* \* \*

Mr. McGuire said that each officer in the corporation was to receive approximately 75,000 shares apiece, but at a later date the officers would return to him 50,000 shares each at his direction.

9. Weissenbach, the buyer of stock in count 7, testified as to a meeting during the latter part of February 1958 at which he was present with Blumner and Perry:

I raised the question of Mr. Blumner as to the reason for forming the three separate corporations and then asked for an explanation as to why and in what manner mergers or transfer of interests was to be carried out, and Mr. Blumner explained that the nature and dimensions of this particular exploration problem warranted progressively increasing capital, but the prime interest at the moment was to establish discovery or to find oil, and then as additional leases—some of which Mr. McGuire was still holding for insertion into the activity—as these were to be exploited a separate corporation would be formed, another Regulation A, and so forth, and the fact that full registration for the total amount for a much larger project would require registration procedure which might take upwards of six or seven months.

Perry's claim that he was unaware that McGuire controlled the three companies can be answered simply. Brandes and Weissenbach testified that Perry was present at the meetings at which Blumner made the statements concerning McGuire's control which are set forth in footnotes 8 and 9 supra. This is clearly sufficient to support the finding that Perry as well as Blumner knew that the corporations were under McGuire's control. Nor does Perry's claim that the evidence does not support the finding that he knew that the aggregate offerings of the three companies exceeded $300,000 deserve any serious attention. Brandes testified that the conspirators in their meetings of November 1 and 2, 1957 spent a good deal of time discussing the "technical" aspects of setting up the Regulation A offerings, and Perry must have learned of the amounts of the proposed offerings and gleaned the reasons therefor from this discussion. See footnote 8 supra. Finally, there was indeed sufficient evidence presented at the trial to support the trial court's findings that Perry knew his statements concerning Haratine made by him to Mrs. Riley and to Lauro were false and that he omitted material facts necessary to be stated if the facts he did state were not to be misleading.

### III. *Perry's Defense of Temporary Insanity.*

Perry's principal defense at the trial was that he was not responsible for his actions at the times when the various crimes here involved were committed because he was temporarily insane due to his diabetic condition. It was not contended that Perrry suffered from any mental defect unrelated to diabetes.

Testimony at the trial indicated that diabetes could affect a person's mental processes only if it causes arteriosclerosis which permanently affects the brain, or if it causes "severe ketosis," a condition in which the body uses fat for energy and produces acetone in the body. Ketosis is detected by the presence of more than a trace of acetone in the patient's urine and is treated by administering a large dose of insulin, 100 units or more, to the patient within 24 hours after the condition is discovered. Severe ketosis can render a person unable to perform such normal functions as walking or driving an automobile.

It is not disputed that if Perry suffered from any mental defect, such defect was caused by ketosis and no other cause. Thus, it was a vital factual issue whether Perry actually suffered from ketosis. The trial court found that:

> The evidence establishes beyond a reasonable doubt that at no time did Perry have a "severe ketosis" from the diabetes from which he undoubtedly was to some extent suffering. Among other things, ketosis is shown by acetone in the urine. The hospital records show that while Perry was there he had no acetone in his urine. I reject the testimony of Dr. Maloney that there was acetone at the October 1, 1958 examination. I do this not for fabrication but because Dr. Maloney had no records to support his testimony. That he could remember details of an examination seven years before is incredible.
>
> Moreover, there is nothing in the hospital records reflecting any mental incapacity of Perry and the explanation of this by Dr. Maloney is not convincing. While Perry was in the hospital he was given only five units of insulin on one occasion; Dr. Maloney described this as a "small dose," whereas Dr. Spritz satisfied me that if a diabetes patient had ketosis (and thus could be mentally affected) at least 100 units of insulin would be required during the first 24 hours after discovery of the condition. 249 F.Supp. at 50.

We cannot say that this evidence was insufficient to support the court's finding that Perry was responsible for his actions.

Perry bases his objection to the trial court's rejection of the insanity defense on the fact that the trial court relied on the *M'Naghten* definition of insanity, see Daniel M'Naghten's Case, 10 Cl. &

Fin. 200, 8 Eng.Rep. 718 (H.L. 1843). In United States v. Freeman, 357 F.2d 606 (2 Cir. 1966), a case decided after the trial court's decision, we rejected the *M'Naghten* rule in favor of a more liberal definition of insanity. This shift in the definition of the nature of a mental defect which is legally sufficient to absolve a person of responsibility for his actions does not help Perry. The trial court did assume that the *M'Naghten* rule would apply, 249 F.Supp. at 49, but it did not apply that rule or any other rule. It found as a fact that Perry had not suffered from any mental defect at all and did not reach the stage of comparing such a defect with a legal definition of insanity.

IV. *Other Points Raised by Appellants.*

 Blumner and McGuire claim that the form of the indictment with respect of counts 2 through 8 [10] was fatally

---

10. The challenged language of the Indictment reads as follows:

COUNTS TWO THROUGH EIGHT

The Grand Jury further charges:

On or about the dates hereinafter specified in Counts two through eight in the Southern District of New York, John A. McGuire, Edmond G. Blumner and Herbert Perry the defendants unlawfully, wilfully and knowingly, directly and indirectly, made use of means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, to wit, common capital stock of Haratine Gas & Oil Company, Inc., through the use and medium of a prospectus and otherwise, there not then being in effect with the Securities and Exchange Commission a registration statement as to such securities, in that the defendants sent, carried and delivered and caused to be sent, carried and delivered by mail and by means and instruments of transportation in interstate commerce certain matter hereinafter described in Counts 2 through 8:

| Count | Date | Matter |
|---|---|---|
| 2 | September 2, 1958 | Confirmation slip to: Mabel G. Riley 703 East Watauga Johnson City, Tennessee |
| 3 | September 3, 1958 | Confirmation slip to: William Lauro 1823 East 33rd Street Brooklyn, New York |
| 4 | September 4, 1958 | Confirmation slip to: Frederick Flatto 595 Madison Avenue New York City |
| 5 | September 10, 1958 | Confirmation slip to: Leno J. Fillipi 1524 Liberty Street Erie, Pennsylvania |
| 6 | October 9, 1958 | Confirmation slip to: William Lauro 1823 East 33rd Street Brooklyn, New York |
| 7 | October 9, 1958 | Confirmation slip to: Joseph Weissenbach c/o Power Search Corporation Post Office Box 365 Fresno, California |
| 8 | October 17, 1958 | Confirmation slip to: Leno J. Fillipi 1524 Liberty Street Erie, Pennsylvania |

(Title 15, United States Code, Sections 77e(a) (1) and 77x; Title 18, United States Code, Section 2.)

defective. The indictment contains the title "COUNTS. TWO THROUGH EIGHT" followed by an introductory paragraph preparatory to the specification of the actual counts. This paragraph charges all the necessary elements of the crimes specified in counts 2 through 8 (using the mails to sell unregistered stock) to be "hereinafter described." The counts themselves are set forth in columnar form and contain only the count number, the date of mailing of the material, the matter which was mailed, and the address of the recipient.

We see no merit to the claim. The indictment is no way ambiguous. With commendable clarity it apprises the defendants of their alleged actions which are claimed to be illegal. No possible confusion could have been created in the defendants' minds as to what the charges were that had been brought against them and as to what the allegations were that they would be required to defend against upon trial. It is true that allegations in one count of an indictment must be specifically incorporated by reference into other counts, United States v. Pearce, 275 F.2d 318 (7 Cir. 1960), but introductory paragraphs not part of another count and specifically referring to the counts involved are considered part of the numbered counts following them. United States v. Taylor, 207 F.2d 437 (2 Cir. 1953).

Blumner also claims that the Jencks Act, 18 U.S.C. § 3500, as applied to this case violates the Due Process Clause of the Fifth Amendment because it requires the trial judge to rule on what material is to be turned over to the defense as well as to act as impartial and unprejudiced trier of fact between defense and prosecution. It is contended that the trial judge is likely to be influenced adversely to the defense by the material he then reads which is not given to the defense. We rejected a similar claim in United States v. Cimino, 321 F.2d 509 (2 Cir. 1963), cert. denied, 375 U.S. 974, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964) in a case in which the material involved and examined by the trial

judge was very prejudicial to the defendants. We adhere to this position. Moreover, we have carefully examined all the material withheld from defendants by the trial judge. Not only do we find that the material was properly excluded but we are unable to see how the trial judge's awareness of any of it could have had a prejudicial effect on the defendants.

Perry raises a different claim relative to the Jencks Act material. Claiming that turned-over material should be available to all persons and not just to trial counsel, Perry's trial attorney refused to examine the Jencks Act material which was made available to the defendant and also failed to cross-examine various government witnesses. On the basis of this position by his attorney, Perry claims he was deprived of effective assistance at trial.

Perry retained trial counsel of his own choice. This counsel was well aware of the availability of the Jencks Act material but as a matter of strategy refused to examine it. Also, Perry's main defense of temporary insanity did not require him to contradict the testimony of the various witnesses who were not cross-examined. There is no showing that this attorney's efforts to defend Perry were deficient in any other way. Under the circumstances, we cannot say Perry was deprived of effective assistance of counsel. See United States v. Garguilo, 324 F.2d 795, 797 (2 Cir. 1963); United States v. Duhart, 269 F.2d 113, 115 (2 Cir. 1959).

Perry also claims that during the pre-indictment investigation an attorney of the SEC orally promised him that he would not be indicted for the crimes for which he was later prosecuted and that, following that commitment, he then answered the questions asked him by this attorney. He claims that the promise was made to induce him to waive his Fifth and Sixth Amendment rights; but, assuming this to be so, Perry was not prejudiced by any induced waiver he may have made because there is no showing that any evidence obtained from him

due to such a promise was introduced in evidence at the trial.

We have carefully examined the remaining contentions advanced by the appellants, whether jointly or severally. We find none that are meritorious, indeed, most of them are completely frivolous.

Affirmed.