**UNITED STATES of America,**

v.

**John A. McGUIRE, Edmond G. Blumner and Herbert Perry, Defendants.**

United States District Court
S. D. New York.

Dec. 9, 1965.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, for United States of America; Thomas J. Cahill, Paul R. Grand, Asst. U. S. Attys., of counsel.

John F. Dailey, Jr., New York City, for defendant McGuire; Lawrence A. D'Ambrosio, Erie, Pa., of counsel.

Edward A. Kole, New York City, for defendant Blumner.

Stanley Kligfeld, New York City, for defendant Perry.

WYATT, District Judge.

This indictment was tried to the Court without a jury. Each of the defendants in writing waived a jury trial, to which the government consented and which the Court approved. Fed.R.Crim.P. 23(a).

The indictment was returned on August 8, 1963 and contains twelve counts.

At the close of the government's case, motions to dismiss counts 5 and 8 were granted, with the consent of the government.

■ The evidence establishes beyond a reasonable doubt, and this Court finds, that the three defendants are each guilty on counts 1, 2, 3, 4, 6 and 7; and that defendant Perry is guilty on counts 9 and 10 in which he was the only defendant named.

The evidence does not establish beyond a reasonable doubt that defendant Perry is guilty on counts 11 and 12, in which he was the only defendant named, and this Court finds defendant Perry not guilty on counts 11 and 12.

The Court finds that the testimony of defendants McGuire and Blumner is in material respects not worthy of belief; to the extent that their testimony is in conflict with testimony offered by the government, their testimony is rejected and the testimony offered by the government is accepted. Defendant Perry did not testify and no inference of any kind has been drawn from this fact.

In October and November 1957, defendants McGuire, Blumner and Perry willfully and knowingly formed a conspiracy to violate certain laws of the United States, specifically Section 5(a) of the Securities Act of 1933 (the "1933 Act") dealing with registration of securities and Section 17(a) of the 1933 Act, an antifraud provision. These laws are found in Title 15 of the United States Code as Sections 77e(a) and 77q(a), respectively.

There were other members of the conspiracy later becoming such from time to time but the important and significant members were McGuire, Blumner, and Perry—their importance and significance having been in the order in which they are just named. The conspiracy lasted until at least October 29, 1958.

In reaching a conclusion as to the existence of a conspiracy and its membership, I have first made such determination from the acts and statements of each defendant before considering as against him the acts and statements of any other member of the conspiracy.

The prime object of the conspiracy was to evade the registration requirements of the 1933 Act, to deceive the Securities and Exchange Commission (the "Commission") as to the control of corporations purporting to qualify for an exemption under Regulation A of the Commission (17 C.F.R. §§ 230.251 and following), and to cause shares of stock of the corporations to be sold by the use of fraud.

■ Since it was a part of the agreement between the defendants that the Commission be deceived, the conspiracy was one also to defraud the United States within the meaning of 18 U.S.C. § 371. Glasser v. United States, 315 U.S. 60, 66, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569 (1910); see United States v. Manton, 107 F.2d 834, 839 (2d Cir. 1939).

So far as McGuire was concerned, it was a part of the plan that he would use his control of the corporate vehicles to take away their moneys and apply them to his own purposes; whether Blumner and Perry knew of this plan of McGuire and of his later actual diversion of funds is not established and is in any event irrelevant.

The formation of the conspiracy was at the initiative of McGuire who at all times was the chief figure. Blumner

and Perry, however, knowingly and willfully entered into a criminal partnership with McGuire, and assisted its plans in every way they could. Blumner as a lawyer was more active and more helpful in promoting the objects of the conspiracy than Perry, but Perry as a salesman of stock did whatever he could to advance the common purposes. When it is stated herein that "defendants caused" something to be done, it will be understood that McGuire was the dominant force, aided in their respective fields by Blumner and Perry.

Defendants caused to be organized on November 22, 1957, three Delaware corporations: Asta-King Petroleum, Inc. ("Asta-King"), Tamarac Gas and Oil Company, Inc. ("Tamarac"), and The Haratine Gas and Oil Company, Inc. ("Haratine").

At the time of their organization and at all relevant times thereafter, and up to at least October 29, 1958, defendant McGuire controlled Asta-King, Tamarac, and Haratine and this fact was at all relevant times known to defendants Blumner and Perry.

Between January 23 and April 8, 1958, defendants caused Asta-King to sell to the public 22,200 shares of its stock for $299,970.

Between June 5 and July 29, 1958, defendants caused Tamarac to sell to the public 266,640 shares of its stock for $299,970.

Between August 5 and October 29, 1958, defendants caused Haratine to sell to the public approximately 67,000 shares of its stock for approximately $100,500.

Asta-King, Tamarac and Haratine each purported to qualify for the exemption from registration provided by Regulation A. Notifications as required by the Commission (17 C.F.R. § 230.255) were filed by each corporation, together with the necessary exhibits, including an offering circular. Such notification and other material were filed by Asta-King on January 8, 1958; by Tamarac on May 20, 1958; and by Haratine on June 23, 1958. No registration statement was

ever in effect as to any shares of Asta-King, Tamarac, or Haratine (15 U.S.C. §§ 77e, 77f).

Regulation A is issued by the Commission under Section 3(b) of the 1933 Act, as amended, (15 U.S.C. § 77c(b)) which empowers the Commission to exempt from the registration requirements of the 1933 Act any class of securities so long as the aggregate amount at which any issue of securities is offered to the public does not exceed $300,000.

The Commission in Regulation A has in effect exempted from registration all issues on the condition that they do not exceed $300,000.

To prevent the obvious abuse illustrated in the case at bar, the regulations of the Commission, specifically Rule 254 (17 C.F.R. § 230.254), provide that in determining whether the condition is met that the "aggregate offering price" may not exceed $300,000, there must be included not only all securities offered by the issuer itself but all securities sold "within one year prior to commencement of the proposed offering" by all of the "affiliates" of the issuer.

The definition of "affiliate" includes a "person * * * under common control" with the issuer. Rule 251 (17 C.F.R. § 230.251).

It was, of course, essential to their plans that the conspirators suppress and conceal the fact that Asta-King, Tamarac and Haratine were under the common control of McGuire; otherwise the non-exempt character of the Tamarac and Haratine offerings would be revealed.

The offering circulars of the three corporations and the other papers filed with the Commission were deceptive, false, and fraudulent to the knowledge of each of the defendants. In the case of each corporation, there was a fictitious appearance created that the corporation was managed and controlled by its directors, whereas in truth and in fact the corporation was managed and controlled by McGuire.

■ Neither the Tamarac offering nor the Haratine offering was entitled

to any exemption from the registration requirements of the 1933 Act (15 U.S.C. §§ 77e and 77f). This was because Asta-King, Tamarac and Haratine were "affiliates" (17 C.F.R. § 230.254) since they were under the common control of McGuire. The offering price for Tamarac added to the $299,970 realized from sales to the public of Asta-King stock obviously exceeded the $300,000 limit, and the later Haratine offering further increased the excess.

Under date of October 29, 1958, the Commission made an order under its Rule 261 (17 C.F.R. § 230.261) temporarily suspending the exemption of the Haratine offering; by order made July 14, 1959, and on stipulation the suspension was made permanent. These orders, however, were not in any way based on the common control of McGuire because the Commission had not then discovered such common control. The suspension was based entirely on a failure by Haratine to file certain sales material as required and also because the sales material being used was in certain respects (not having to do with control) found to be and stipulated to be fraudulent. The suspension is irrelevant to the determination made in the case at bar that no exemption was ever available for the Haratine offering.

Because of the common control of McGuire of the three corporations and because the aggregate of their offerings exceeded $300,000, neither the Tamarac nor the Haratine offerings were exempt from registration. The sales of their stock by the use of the mails or any means or instruments of transportation or communication in interstate commerce were in plain violation of law (15 U.S.C. § 77e).

The offering circulars of the three corporations were not only fraudulent in concealing control by McGuire. They were false and fraudulent in many other respects, both because statements made were untrue and because there were omissions of material facts.

The fraud and deceit planned and practiced by the defendants is further illustrated by the formation of Herbert Perry & Co. Inc., a corporation (sometimes "Perry, Inc."). Defendants caused Perry, Inc., to be organized to act as a registered broker and dealer (15 U.S.C. § 78o) in the sale of Haratine stock so as to avoid the necessity of paying for sales efforts to some one outside the conspiracy.

McGuire, to the knowledge of Blumner and Perry, controlled Perry, Inc., which upon its organization became a member of the conspiracy. The attempted use of Harold Wolfe as a front man in, or facade for, Perry, Inc., to conceal McGuire is transparent.

The evidence establishes beyond a reasonable doubt (indeed, beyond any doubt) that Perry, Inc., was, through the control over it by McGuire and otherwise, a member of the conspiracy along with McGuire, Blumner, Perry and others; the arguments of Blumner to the contrary—in an attempt to eliminate the overt acts of Perry, Inc.—are in no way convincing.

The three defendants, but especially Blumner and Perry, misled and deceived the Commission and the public by suppressing and concealing the control by McGuire of Herbert Perry & Co., Inc.

The overt acts alleged in the indictment as 1, 2, 3, 5, 6 and 7 are established by the evidence beyond a reasonable doubt and all such acts took place in this District.

Perry, Inc., sent through the mails from New York (70 Wall Street) to Mrs. Riley a confirmation of purchase by her of, and a receipt for her payment of the purchase price for, 200 shares of Haratine stock. The confirmation is dated September 2, 1958 and the receipt is dated September 11, 1958. (overt act 1; GX 40 ("GX" refers to "Government Exhibit"); Riley tr. 18).

Perry, Inc., sent through the mails from New York (70 Wall Street) to William Lauro a confirmation of purchase by him of 1100 shares of Haratine stock. The confirmation is dated September 3, 1958. (overt act 2; GX 143; Lauro tr. 12).

Perry, Inc., sent through the mails from New York (70 Wall Street) to Frederick Flatto a confirmation of purchase by him of, and a receipt for his payment of the purchase price for, 1000 shares of Haratine stock. The confirmation is dated September 4, 1958 and the receipt is dated September 26, 1958. (overt act 3; GX 144; Lauro tr. 6).

Perry, Inc., sent through the mails from New York (70 Wall Street) to William Lauro a confirmation of purchase by him of, and a receipt for his payment of the purchase price for, 200 shares of Haratine stock. The confirmation is dated October 9, 1958 and the receipt is dated October 21, 1958. (overt act 6; GX 143A; Lauro tr. 12).

Sometime between September 15, 1958, and October 21, 1958, Perry, Inc., at New York (70 Wall Street) accepted from Joseph Weissenbach a check for $110 sent by him through the mails in part payment for Haratine stock. (overt act 7; GX 156, 157; Weissenbach tr. 76).

All of these overt acts were part of the efforts of defendants to make sales of Haratine stock and were clearly to effect the object of the conspiracy.

Shortly after September 8, 1958 Blumner deposited in Bankers Trust Company in New York County a check for $2,500 to his order drawn by Springfield Gas and Oil Company, a trade name for McGuire (overt act 5; GX 137).

The giving, receipt, and deposit of this check were clearly acts to effect the object of the conspiracy. It was necessary to have the continued participation of the members of the conspiracy in order to keep it going. This continued participation was secured by periodic distribution of financial rewards, of which this particular $2,500 was one.

What was in fact done by the three defendants in respect of Asta-King, Tamarac, Haratine, and Perry, Inc., is itself powerful evidence of the illegal combination and agreement to bring all that about. This evidence is in addition to other and more direct evidence.

The findings so far have related to the first, the conspiracy count.

The substantive counts will now be taken up.

As to count 2, the evidence establishes beyond a reasonable doubt that defendant Perry for Perry, Inc., in September 1958 sold 200 shares of Haratine stock to Mabel G. Riley of Johnson City, Tennessee. A confirmation slip, an offering circular, the receipt for payment, and a stock certificate were each sent to Mrs. Riley in September 1958 by Perry, Inc. through the mails.

As to count 3, the evidence establishes beyond a reasonable doubt that defendant Perry for Perry, Inc., in September and October 1958 sold 1100 shares of Haratine stock to William Lauro of Brooklyn. A confirmation slip and the offering circular were each sent to Lauro in September 1958 by Perry, Inc., through the mails.

As to count 4, the evidence establishes beyond a reasonable doubt that defendant Perry for Perry, Inc., in September 1958 sold 1000 shares of Haratine stock to Frederick Flatto, 595 Madison Avenue, in the City of New York. A confirmation slip and a receipt for payment were each sent to Flatto in September 1958 by Perry, Inc., through the mails.

As to count 6, the evidence establishes beyond a reasonable doubt that defendant Perry for Perry, Inc., in October 1958 sold 200 shares of Haratine stock to the same Lauro already mentioned under count 3. A confirmation slip and a receipt for payment, each in respect of these 200 shares, were sent to Lauro in October 1958, by Perry, Inc. through the mails.

As to count 7, the evidence establishes beyond a reasonable doubt that defendant Perry for Perry, Inc., in September and October 1958 sold in two lots an aggregate of 1400 shares of Haratine stock to Joseph Weissenbach, P. O. Box 365, Fresno, California. A sales letter, the offering circular, confirmation slips, and receipts were each sent to Weissenbach in September and October 1958 by Perry, Inc., through the mails.

No registration statement was at any time in effect as to the stock of Haratine and it was required to be registered since no exemption, under Regulation A or otherwise, was available for the offering.

When Perry and Perry, Inc., made use of the mails to sell the stock of Haratine, as the evidence establishes was done in respect of the transactions covered by counts 2, 3, 4, 6 and 7, there was a clear violation of 15 U.S.C. § 77e(a) (1).

■ Defendants McGuire and Blumner are just as guilty of these substantive offenses as Perry. This result follows on two grounds.

■ The sales by Perry of Haratine stock were in furtherance of the conspiracy to which all three defendants and Perry, Inc. were parties. Where a "substantive offense is committed by one of the conspirators in furtherance of the unlawful project", all members of the conspiracy are guilty of that substantive offense. Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946).

Defendants McGuire and Blumner are likewise guilty of the substantive offenses charged in counts 2, 3, 4, 6 and 7 because one who "aids, abets, counsels, commands, induces or procures" the commission of an offense is guilty as a principal. 18 U.S.C. § 2.

It remains to consider counts 9, 10, 11, and 12 which charge Perry alone with a violation of the antifraud section (15 U.S.C. § 77q(a)).

As to count 9, the evidence establishes that Perry made the following representations, among others, to Mrs. Riley:

1. that in August and September 1958 Haratine had an oil producing well;

2. that it was a good strong company;

3. that purchasers would soon double and triple their money;

4. that the Lieutenant Governor of Pennsylvania had invested money in Haratine; and

5. that the stock of Haratine was "selling like wildfire".

Each of these representations was false and known to Perry to be false.

As to count 10, the evidence establishes that Perry made the following representations, among others, to Lauro:

1. that the stock of Haratine was going to be worth $3 per share;

2. that the market price of the stock was going to be at least $3 per share;

3. that the Haratine management "were responsible people"; and

4. that Haratine had good positions in the oil fields.

Each of these representations was false and known to Perry to be false.

As to counts 9 and 10, in addition to the false representations already set out, each of the persons defrauded (Mrs. Riley and Lauro) was sent through the mails by Perry an offering circular of Haratine. This not only contained many untrue statements of material facts but Perry omitted to state many material facts necessary in order to make the statements in the Haratine offering circular not misleading, among others, that McGuire controlled Asta-King, Tamarac, Haratine and Perry, Inc.

As already indicated, it is established that in connection with the sale of Haratine stock to Mrs. Riley and to Lauro, there was extensive use of the mails to obtain money and property from them by means of untrue statements of material facts and omission to state material facts necessary in order to make the statements made not misleading.

The essential elements of the offense are present as to counts 9 and 10 and Perry is found guilty on such counts.

As to count 11, the evidence does not satisfy me beyond a reasonable doubt that whatever representations were made by Perry to Flatto were in violation of the statute (15 U.S.C. § 77q(a)), considering also that the record does not show that an offering circular was given to Flatto in connection with the sale.

As to count 12, the evidence does not satisfy me beyond a reasonable doubt that Perry committed two separate violations of the antifraud statute (15 U.S.C. § 77q(a)) in connection with the sale of a total of 1300 shares of Haratine stock to Lauro. With respect to counts 3 and 6, which charge use of the mails, etc. to sell an unregistered security in violation of 15 U.S.C. § 77e(a) (1), the evidence shows two separate sales to Lauro, one of 1100 shares with "execution date" of September 3, 1958 and one of 200 shares with "execution date" of October 9, 1958. Counts 3 and 6 charge two separate violations because the mails were used on two separate occasions and each mailing is a separate offense. United States v. Greenberg, 30 F.R.D. 164, 167–169 (S.D.N.Y. 1962); United States v. Hughes, 195 F.Supp. 795, 799 (S.D. N.Y. 1961); United States v. Van Allen, 28 F.R.D. 329, 342 (S.D.N.Y. 1961). But the record does not satisfy me that there were false representations made as to the October 9, 1958 sale of 200 shares to Lauro separate and apart from those made to him to induce the September 3, 1958 sale of 1100 shares. The record would rather show that the false representations were made at the same time as to both sales. Cf. United States v. Cashin, 281 F.2d 669, 673–674 (2d Cir. 1960). I am not satisfied beyond a reasonable doubt, therefore, that Perry is guilty as charged in count 12.

Defendant Perry suggests that if there was any conspiracy he withdrew from it on September 28, 1958. Presumably this suggestion is meant as a defense to counts 6, 7 and 12, which charge offenses on dates after September 28, 1958. The burden of establishing a withdrawal is on the defendant who asserts it; an end to activity is not enough; affirmative action by such defendant is required to be shown, as for example, making a clean breast to the authorities or notifying the other members of the conspiracy of a termination of participation. United States v. Borelli, 336 F.2d 376, 388–390 (2d Cir. 1964), cert. denied under names Cinquegrano v. United States and Mogavero v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). The most that Perry can point to is that after Smith went to work for Perry, Inc. on September 29, 1958, Perry himself may not have thereafter appeared in the offices of Perry, Inc. This was not any withdrawal by Perry from the conspiracy but was in fact by direction of McGuire in the belief (shared by Perry and the other conspirators) that the replacement of Perry by Smith would promote the object of the conspiracy. Indeed, the idea was that Perry after September 29, 1958 would "establish public relations" outside the Perry, Inc. offices and operate on an "outside contact basis". Perry has not merely failed to sustain his burden of proof as to withdrawal. There is no evidence of any withdrawal.

Defendant Perry also claims that he is not guilty by reason of temporary insanity, accepting for this purpose the classic definition from Daniel M'Naghten's Case, (10 Cl. & Fin. 200, 8 Eng.Rep. 718 (H.L.1843); see also Papers and addresses of Felix Frankfurter 1956–1963 —Of Law and Life & Other Things That Matter 1–4 (Kurland ed. 1965)), namely, that he had "such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong" (10 Cl. & Fin. at 208, 8 Eng.Rep. at 722; quoted in Proposed Findings of Fact and Conclusions of Law for defendant Perry, page 3).

The evidence for Perry to support this claim is almost entirely the testimony of his physician, Dr. Maloney, who had been such since 1950.

Dr. Maloney testified in substance that Perry came to him on October 1, 1958, complaining of vision difficulty, weight loss, etc.; that he examined Perry and found, among other things, that his urine contained 4-plus sugar and 1-plus acetone; that from his physical findings and the history his "impression" was that Perry was a "severe diabetic"; that his diabetes was so severe that he was "mentally affected" and "did not know

the difference between right and wrong"; and that in the doctor's opinion this condition had existed for about three months, or from about July 1, 1958.

It also appeared from Dr. Maloney's testimony and from hospital records that Perry was in Columbus Hospital for diabetes milletus as a patient of Dr. Maloney from October 20 to the late afternoon of October 22, 1958 at which time he was discharged at his own request.

For purposes of decision, I will assume that enough was shown for Perry to overcome the presumption of sanity and to place upon the government the burden of proof to show that Perry was sane when the offenses were committed. See Davis v. United States, 160 U.S. 469, 485–487, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

■ The government has sustained the burden of proof to show that Perry was sane at the relevant times.

It is established that before October 1, 1958, no one supposed that Perry was of unsound mind. The members of the conspiracy and others who dealt with him did so believing that he was entirely normal. There appears to have been not even a suspicion to the contrary.

It was also established by the government through Dr. Spritz, a physician specializing in diabetes, that not all persons suffering from diabetes are affected mentally thereby. Indeed, this is a matter of such universal observation that doubtless the Court could take judicial notice of it.

Dr. Spritz testified that diabetics can suffer mental effects either (a) from arteriosclerosis, to which they are "particularly susceptible" or (b) from a "severe ketosis" (an abnormal increase of ketone bodies, occasionally caused by diabetes).

Arteriosclerosis was expressly disclaimed for Perry; indeed, it was stated for Perry that no claim was made that he was insane or mentally affected when he left the hospital on October 22, 1958.

The evidence establishes beyond a reasonable doubt that at no time did Perry have a "severe ketosis" from the diabetes from which he undoubtedly was to some extent suffering. Among other things, ketosis is shown by acetone in the urine. The hospital records show that while Perry was there he had no acetone in his urine. I reject the testimony of Dr. Maloney that there was acetone at the October 1, 1958 examination. I do this not for fabrication but because Dr. Maloney had no records to support his testimony. That he could remember details of an examination seven years before is incredible.

Moreover, there is nothing in the hospital records reflecting any mental incapacity of Perry and the explanation of this by Dr. Maloney is not convincing. While Perry was in the hospital he was given only five units of insulin on one occasion; Dr. Maloney described this as a "small dose", whereas Dr. Spritz satisfied me that if a diabetes patient had ketosis (and thus could be mentally affected) at least 100 units of insulin would be required during the first 24 hours after discovery of the condition.

It is significant also that Dr. Maloney had very little if any basis for concluding that for three months before October 1, 1958, Perry did not know right from wrong. The doctor had not seen Perry for five months and neither on October 1 nor thereafter does he appear to have directed his attention to mental condition. Since he permitted Perry to leave his office on October 1 and permitted him to leave the hospital on October 22, 1958, the reasonable inference is that he considered him sane. Dr. Maloney is not a psychiatrist and does not specialize in mental diseases. It may also be noted that the hospital record of Perry's admission has the note: "routine adm. [admission] case"; two days later, on discharge the note is: "discharged, ambulatory, went out alone"; and the note of Dr. Maloney is "condition improved".

The most telling evidence that Perry was not insane in the period before October 1, 1958, is the recorded telephone conversations on September 29, 1958 between him and McGuire (Exs. 161A, 161B).

These show Perry perfectly aware of what he was doing and well able to distinguish right from wrong.

The defense of temporary insanity is not available to defendant Perry.

All arguments of fact and of law submitted for defendants have been considered, even though they have not been discussed.