392 F.2d 344
 UNITED STATES of America, Appellee,
v.
Nathan WECHSLER, Appellant.
UNITED STATES of America, Appellee,
v.
George FAIGEN, Appellant.
UNITED STATES of America, Appellee,
v.
Seymour FAIGEN, Appellant.
UNITED STATES of America, Appellee,
v.
Robert C. COTTEN, Jr., Appellant.
UNITED STATES of America, Appellee,
v.
Sigmund GOLDBLATT, Appellant.
UNITED STATES of America, Appellee,
v.
A. Claiborne LEIGH, Appellant.
 No. 11331.
 No. 11347.
 No. 11348.
 No. 11352.
 No. 11355.
 No. 11356.
 United States Court of Appeals Fourth Circuit.
 Argued November 7, 1967.
 Decided February 5, 1968.
 Certiorari Denied June 17, 1968.
 
 See 88 S.Ct. 2283.
 David I. Shapiro, Washington, D. C., (Frank F. Flegal and Dickstein, Shapiro & Galligan, Washington, D. C., on the brief) for appellants in Nos. 11331 and 11355.
 Thomas R. Dyson, Jr., Washington, D. C., (Raymond W. Bergan and Williams & Connolly, Washington, D. C., on the brief) for appellant in No. 11352.
 E. Waller Dudley, Alexandria, Va., (Boothe, Dudley, Koontz, Blankingship & Stump, Alexandria, Va., on the brief) for appellants in Nos. 11347 and 11348.
 LeRoy E. Batchelor, Arlington, Va., for appellant in No. 11356.
 Philip Wilens and Edward T. Joyce, Attys., Dept. of Justice, Charles Ruff and Jeremy Zimmermann, Attys., Dept. of Justice, and C. V. Spratley, Jr., U. S. Atty., on the brief, for appellee.
 Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.
 CRAVEN, Circuit Judge:
 
 
 1
 Involved here is a scheme by certain partners in a real estate development company (Nathan Wechsler, Sigmund Goldblatt, George Faigen, and Seymour Faigen) to bribe two members of the Board of Supervisors of Fairfax County, Virginia, (Robert Cotten and Clairborne Leigh) to vote for the re-zoning of land in which the partnership was interested. Goldblatt, Cotten, Leigh and George Faigen appeal from their convictions for substantively violating 18 U.S.C.A. § 1952(a) (3) and for conspiring to violate the same statute; Wechsler and Seymour Faigen were acquitted on the substantive count and appeal from their convictions on the conspiracy count. The central question presented is whether the offense of using a facility in interstate commerce to promote, manage, establish, or carry on bribery and thereafter performing an act to promote, manage, establish, or carry on bribery is to be equated with, and limited by, the state law of bribery. We think not and affirm the convictions of all appellants.
 
 
 2
 In 1960, the developer-defendants were interested in procuring a zoning change from residential to mobile homes for 84.3 acres of land in Fairfax County which they wanted to use as a trailer park. Sufficient evidence was introduced at trial for the jury to find the following facts. On March 9, 1960, George Faigen filed an application for the re-zoning. A year later, but before the Board of Supervisors had acted upon the application, the four defendant-partners placed a check for $5,500 in escrow in the Security Bank of Washington for John C. Somers, an attorney who often handled zoning cases in Fairfax County on a contingent fee basis, conditioned upon favorable action by the Board. Two months later, on July 26, 1961, the Board acted favorably on Faigen's application on the affirmative votes of Leigh, Cotten, DeBell[1] and another. On August 7, the developer-defendants instructed the Security Bank to release the $5,500 check to Somers who deposited it to his own account on August 18, the day on which he was notified by the bank. Somers was instructed by Leigh to run the check through his own account and then make out a check for the same amount to Leigh, and did so. Somers had performed no work for developer defendants at any time, and in 1961 he knew none of them except Goldblatt.[2] Leigh deposited the check to his account on August 19, and on August 22 he wrote a check to DeBell for $1,308.33; on August 23, he wrote a check to himself for $1,333; and on September 9, he wrote a check to Cotten for $1,000. Cotten's secretary entered the $1,000 check as a legal fee in Cotten's checkbook and receipts book and deposited the check to Cotten's account on September 15. On September 13, 1961, Congress enacted 18 U.S.C. § 1952. Because the state courts of Virginia set aside the original Board action, it was necessary for George Faigen to file a new application on June 20, 1962. This second application was considered by the Board on July 25, 1962, and again it was approved, this time on the affirmative votes of Cotton, Leigh, DeBell, and two others. Three letters, two by Goldblatt and one by George Faigen, connected with the effort to procure the re-zoning were mailed on June 17 and 18 and on July 21, 1962.
 
 
 3
 The most serious argument advanced by the appellants, and the one on which most of their other arguments depend, is that their crime was complete before the statute was enacted. We disagree. Their theory is that under Virginia law the crime of bribery is complete upon the giving, offering, or promising of a bribe even though the official act to be done in consideration therefor is to occur in futuro. The fallacy in their argument lies in a too heavy reliance on state law. The state crime serves "only as a background identification of the unlawful activities." United States v. Wingo (6th Cir. 1967)*; United States v. Kubacki, 237 F.Supp. 638, 643 (E.D.Pa.1965). We have no doubt that when the money passed, if not before, the state law of bribery had been violated and that appellants could then have been indicted in the state courts; in that sense their crime was complete. But, their crime was not yet completed. Their activities continued beyond that point and indeed, beyond the date on which the statute was enacted. The manifest purpose of the statute is to deny the use of facilities in interstate commerce to those who would effect a wrong on the people by corrupting public officials. The wrong was not done to the people until the re-zoning was accomplished and the accomplishment of that wrong, after the use of a facility in interstate commerce, is one of the activities at which the statute is aimed. Thus, the federal crime continued until the re-zoning was accomplished on July 25, 1962.
 
 
 4
 The statute was enacted on September 13, 1961; on September 15, Cotten caused the check from Leigh to be deposited in his bank account, and the jury could have found that this check was in payment for Cotten's vote. Depositing that check in a bank for collection was the use of a "facility in interstate or foreign commerce."[3] On July 25, 1962, Cotton voted in favor of the re-zoning. Thus, he used a facility in interstate commerce to facilitate the carrying on of bribery and thereafter performed the carrying on of bribery, squarely within the terms of the statute, after the statute was enacted. As applied to Cotten, then, the statute had no ex post facto effect.
 
 
 5
 By the same token, the conspiracy convictions of each of the appellants must be affirmed. Appellants argue that a new trial is necessitated by the trial judge's instruction that the jury could convict if one of the conspirators committed any of the several overt acts charged in the indictment, several of which were not acts in furtherance of bribery and occurred, under appellants' theory, after the conspiracy had ended. But in order to have convicted Cotten of the substantive offense, the jury must have found that he deposited his check from Leigh, and this was one of the overt acts to which the trial judge referred. Each member of the conspiracy is chargeable with acts performed by other members in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[4] Further, appellants were not charged with a conspiracy to commit bribery, but with a conspiracy to violate 18 U.S.C. § 1952.[5] Each of the overt acts listed in the indictment were acts which would have furthered this conspiracy and each was performed after the statute was enacted and before the conspiracy ended, according to our holding, on July 25, 1962, when the Board acted affirmatively on the re-zoning application.
 
 
 6
 On the other hand, rather serious problems are raised in connection with the substantive convictions of each of the appellants other than Cotten. But because we affirm their conspiracy convictions and because the sentences on each count are to run concurrently, a reversal of the substantive convictions would be fruitless. We, thus, find it unnecessary to resolve those problems.[6] Hirabayashi v. United States, 320 U.S. 81, 85, 63 S. Ct. 1375, 87 L.Ed. 1774 (1943); Gorin v. United States, 312 U.S. 19, 33, 61 S.Ct. 429, 85 L.Ed. 488 (1941); Brooks v. United States, 267 U.S. 432, 441, 45 S. Ct. 345, 69 L.Ed. 699 (1925).
 
 
 7
 Many of the other arguments advanced by appellants are dependent upon the answer to the problem just discussed and, hence, fall with the statutory construction that we have adopted. However, there remain two arguments that merit brief mention. Appellant Leigh urges that it was error for the trial judge to require the defendants to agree on a trial location within the Eastern District of Virginia as a condition for fixing the place of trial somewhere within the district other than Alexandria under Fed.R.Crim.P. 18. But a motion for change of venue under Fed.R.Crim.P. 21(a) had already been denied; the condition was merely an attempt by the trial court to accommodate the defendants in keeping with the rule's mandate that the place of trial is to be fixed within the district "with due regard to the convenience of the defendant and the witnesses."
 
 
 8
 Second, appellants contend that it was error for the trial judge to limit the testimony of William DeMik, an attorney. DeMik, on direct examination, testified that Wechsler had asked him about Somers, that he had investigated and had reported to Wechsler that Somers was an attorney who was extremely well connected with the Board of Supervisors. He was then asked if he had given Wechsler any advice; at that point the trial judge interrupted and sua sponte interposed an objection. The offer of proof was that DeMik would testify that he had advised Wechsler to settle with Somers thus supporting defendants' theory that the $5,500 had been put in escrow as settlement of a legal fee due to Somers. We find it unnecessary to decide if exclusion of this testimony was error, for we find no effect on the substantial rights of the parties within the meaning of 28 U.S.C.A. § 2111. Dobrow, the fifth partner, testified that Somers had been employed as an attorney to assist in the zoning, that a fee of $15,500 had been discussed, that Wechsler had been delegated by the partners to annul the preliminary arrangements after Gibson, another attorney retained to work on the same matter, had refused to work with Somers, and that a $5,500 settlement had been arranged with Somers. Further, another witness testified that he had told Weschler, after investigating, that Somers was a person not without influence and that he was reasonably certain that Somers "could be somewhat harmful." There is, then, very little that DeMik's testimony could have added to the jury's knowledge. Moreover, the contentions of the defendants were carefully spelled out in the charge to the jury. In these circumstances, we can find no prejudice justifying a new trial. See, Harper v. United States, 143 F.2d 795, 806 (8th Cir. 1944).
 
 
 9
 We have carefully considered the other numerous arguments advanced on behalf of all appellants and find them to be without merit.
 
 
 10
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Acquitted below
 
 
 [2]
 Somers also testified that he had not reported the check as income on his 1961 tax return and that he had invoked the Fifth Amendment six times before the Grand Jury after which he had been given immunity
 
 
 *
 On December 8, 1967, the United States Court of Appeals for the Sixth Circuit entered an order in Wingo withdrawing the opinion and vacating the order affirming the judgment, and restoring the case on the docket as a pending appeal
 
 
 [3]
 When one deposits a check, there would seem to be little doubt that he is using a facility in interstate commerce. Banks have often been held to be involved in interstate commerce for other purposes. E. g., N.L.R.B. v. Bank of America, 130 F.2d 624 (9th Cir. 1942) (National Labor Relations Act); Lorenzetti v. American Trust Co., 45 F.Supp. 128 (N.D.Cal.1942) (Fair Labor Standards Act). Moreover, Government Exhibit No. 12, the check from Leigh to Cotten, shows that the check was drawn on a Virginia bank and bears the endorsement of a Washington, D. C. bank. Nor do we doubt that the evidence was sufficient for the jury to find the requisite statutory intent. See, United States v. Wingo (6th Cir. 1967). To paraphrase our holding in an analogous situation, there must be some connection between the unlawful activity and the use of a facility in interstate commerce, but "we think it sufficient under section 1952 that the defendant knowingly caused to be transmitted interstate * * * proceeds of a [bribery] which was unlawful under the [Virginia] statute." United States v. Hawthorne, 356 F.2d 740, 742 (4th Cir. 1966)
 
 
 [4]
 Since Seymour Faigen has been acquitted of the substantive count and since the punishment of the other appellants would not be affected, we decline to consider whether Cotten's commission of the substantive offense was in furtherance of the conspiracy so as to make all conspirators equally liable for the substantive offense as well as the conspiracy. See, Pinkerton v. United States, id., 328 U.S. at 647, 66 S.Ct. 1180; United States v. McGuire, 249 F.Supp. 43, 48 (S.D.N.Y. 1965)
 
 
 [5]
 Appellants seriously urge that at the outset the trial judge construed Count I of the indictment to mean that they were charged with a conspiracy to commit bribery, and that later the theory was switched to read Count I as charging them with a conspiracy to procure a rezoning by means of bribery. Since the indictment quite clearly charges a conspiracy to violate § 1952, such a switch, if indeed it occurred, would have entitled appellants to no more than a continuance on the grounds of surprise. No such motion was made
 
 
 [6]
 While we do not decide the question, we note that there is a serious question as to whether any of the appellants, other than Cotten, used a facility in interstate commerce andthereafter performed an act prohibited by the statute. Sigmund Goldblatt and George Faigen both wrote and mailed letters after the date of the statute, but it is seriously urged that the only act that they can be said to have performed thereafter is the appearance of Lytton Gibson, an attorney, before the Board of Supervisors on behalf of the partnership. Although traditional agency concepts might support the theory that Gibson's act was the act of each of the partners, ordinarily such an appearance is precisely the kind of activity in which, as the trial judge charged, any citizen has the right to engage; there is serious doubt that this act was shown to be one which was done to promote bribery. Conversely, Claiborne Leigh was shown to have performed an act after the statute was enacted (i.e., his vote), but it is doubtful that he was shown to have made use of a facility in interstate commerce before that act and after the effective date of the statute.
 
 
 WINTER, Circuit Judge (dissenting):
 
 11
 I agree wholeheartedly that one of the general purposes of Congress in the enactment of 18 U.S.C.A. § 1952 was "to deny the use of facilities in interstate commerce to those who would effect a wrong on the people by corrupting public officials." But in seeking to punish this class of wrongdoers, the government must be held to the exact class of transgressors whose activities Congress outlawed. To my mind, these defendants do not fall into this group.
 
 
 12
 The facts need not be extensively restated; only certain dates should be pointed up. The $5,500 bribe to accomplish favorable rezoning of the tract in question was removed from escrow and deposited to Somers' bank account on August 18, 1961. The next day it went into Leigh's bank account. From there, shares were disbursed to the three public officials who accomplished the rezoning. Specifically, one of them, Bell (who was acquitted at the trial) received a check in payment on August 22, 1961; Leigh, one of the others, made disbursement to himself on August 23, 1961; and the final payment was made to a third, Cotten, by check dated September 9, 1961. Cotten's bookkeeper did not deposit Cotten's check until September 15, 1961. Meanwhile, § 1952 became effective September 13, 1961. Because the initial rezoning was set aside by the courts' repetition of the rezoning, but without the payment of any additional bribe, took place in June and July, 1962. In connection with the second rezoning, the United States mails were used on June 17 and 18 and on July 21, 1962.
 
 
 13
 The statute, which was the basis of the substantive count of the indictment and the violation of which was the object of the alleged conspiracy in the conspiracy count of the indictment, is set forth in the margin.[1] So far as pertinent here, the statute makes unlawful the conduct of one who uses any facility in interstate or foreign commerce, including the mail, with intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of bribery in violation of the laws of the Commonwealth of Virginia and thereafter performs or attempts to perform the crime of bribery in violation of those laws. The Virginia statutes defining the criminal conduct constituting bribery are likewise set forth in the margin.[2] It is clear under Virginia law, as the majority tacitly concedes, that the latest point in time at which the crime of bribery is complete is not when the public official commits the act for which he is bribed, but when the bribe is given and the official accepts the bribe payment.[3]
 
 
 14
 The essential difference between me and the majority is that I think that the statute means what it says when it requires that the use of interstate facilities be accompanied by an intent to violate state law. Both United States v. Wingo (6 Cir. 1967), and United States v. Kubacki, 237 F.Supp. 638 (E.D.Pa. 1965), support this position.[4] But in contravention of these authorities — and the plain language of § 1952 — the majority apparently deems that use of interstate facilities in the loose context of some past violation of state law is sufficient, if subsequent conduct of the defendants can be said to violate the general purpose of § 1952 to protect the people from corruption of public officials.
 
 
 15
 The error of the majority is one of statutory interpretation, but as such it reaches constitutional magnitude. Under the operative facts as stated by the majority and repeated here, there can be no question (putting aside for the moment the check given to Cotten) but that the Virginia crimes of bribery and acceptance of a bribe were "complete and completed" prior to September 13, 1961 — the effective date of § 1952. As will be later shown, the check given to Cotten requires no different conclusion. If the government had sought a conviction on the basis of the use of interstate facilities prior to September 13, 1961, so as to prove such use accompanied by the intent which § 1952 specifically requires, clearly the government would be seeking to give § 1952 retroactive application.[5] This the government could not do. U.S. Constitution, Art. I, § 9; Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). In allowing the government to circumvent this problem by reliance on uses of interstate facilities occurring after September 13, 1961, the majority has denied due process of law, because it has created by judicial fiat a federal crime not brought into existence by § 1952 itself, "the use of interstate facilities with intent to promote an illegal zoning." Such judicial enlargement of a penal statute, if applied retroactively, has the same effect as legislative enactment of an ex post facto law, which is constitutionally prohibited both to the states and to Congress (U.S. Constitution, Art. I, §§ 9 and 10), and has been held to violate the due process amendments. Bouie v. City of Columbia, supra. Because any use of interstate facilities to promote an illegal zoning was federally innocent — even if it occurred after September 13, 1961 — before the majority's decision in this case, the violation of due process follows.
 
 
 16
 Any doubt about the construction to be afforded § 1952 is allayed by reference to Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), and Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), both of which arose under the mail fraud statute. In Kann the defendants perpetrated a fraudulent scheme, pursuant to which they obtained checks payable to them, which they cashed or deposited at a bank. The use of the mails charged as a violation of the federal statute was the mailing of the checks for collection by the banks which cashed them to the banks on which they were drawn. Prior to that mailing, the defendants had obtained effective control over the money which they sought and, as far as they were concerned, their fraudulent plan had reached its fruition and come to a complete rest. The mailing was done by the banks, which had no connection whatsoever with the fraud. The checks were mailed for the bank's own purposes. On these facts it was held that the defendants could not be convicted for violation of the mail fraud statute, because the mailing did not occur with the requisite intent to defraud.
 
 
 17
 In Parr the defendants obtained gasoline and other products and services for themselves by the use of a credit card of a School District which had authorized the defendants to use the card for the District's purposes only. The mailings complained of were two invoices sent by the oil company to the District, and the District's check mailed back in payment. Again, it was found that the mailings by the outsiders were not an integral part of the scheme as planned and executed by the defendants, and that, as a matter of fact, it was completely immaterial to them what the oil company did about collecting its bill. As in Kann, the conclusion reached was that the mailing was without the requisite intent to further the scheme to defraud.
 
 
 18
 Both Kann and Parr clearly stand for the proposition that the mere concurrence of a violation of the general purpose which the relevant federal statute is designed to serve and a use of interstate facilities does not make an act, even though morally reprehensible and violative of state law, a federal crime. That Congress may have prohibited the use of interstate facilities to persons who use those facilities for the purpose of perpetrating frauds does not mean that Congress intends to outlaw that activity under federal law wherever the use of interstate facilities grants to the federal courts a jurisdictional basis to do so. Cf. Carroll v. United States, 326 F.2d 72, 85-86 (9 Cir. 1963). In this regard the following statement in Kann is quite pertinent: "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." 323 U.S., at 94-95, 65 S.Ct. at 151.
 
 
 19
 Similarly, as shown by the clear statutory language, Congress did not intend in § 1952 to reach all wrongs "on the people [effected] by corrupting public officials," but only those wrongs which are violative of specified state laws. The scope of Congressional power and whether it is sufficiently broad to make unlawful the use of interstate facilities for the purpose of corrupting state officials, is not the question. I do not doubt that the power of Congress is this broad, just as I do not doubt that Congress can reach all fraudulent schemes which employ interstate facilities regardless of intent. But our inquiry here must be whether this power was so exercised. The plain wording of § 1952 demonstrates that it was not.
 
 
 20
 The check sent to Cotten merits special scrutiny. If the bribery of Cotten was complete on September 9, the date on which he received the check, it is obvious that under my interpretation of the statute, the clearing of the check through interstate facilities after September 13 could not constitute a violation of § 1952, because (1) this use of interstate facilities could not be made with the requisite intent to violate state law, and (2) no act in performance or attempted performance of the Virginia crime of bribery could be made after the use of interstate facilities, as required by § 1952. This, I think, is dispositive of the case. In the absence of evidence that Cotten knew that the check was worthless at the time he received it and delayed in making his deposit until he was informed that the check would not "bounce" (a position suggested, but not pressed by the government) there seems to be no reason to find as a matter of state law that the bribe was not completed on the date of receipt.[6] It would be unrealistic to infer repudiation of the check from mere delay in depositing it when the check was received pursuant to a prior agreement.
 
 
 21
 Assuming, however, that the bribe was not completed at the time of receipt, it seems abundantly clear that it was completed at the time of deposit. By placing the money in his own account, Cotten evidenced an unequivocal intent to "accept" the illicit benefit, the gravamen of the offense under Va.Code Ann. § 18.1-279. Surely, a public official could be convicted of bribery if he accepted counterfeit money, believing it to be genuine. Similarly, even if a check which he accepted turned out to be worthless, he would still have accepted a bribe. Thus, collection of the check from the drawee bank occurred after the bribe had been completed — even if the bribe was not accepted until the time of deposit — and, accordingly, any use of interstate facilities after that time, specifically bank clearing operations, could not constitute a violation of § 1952 for the same reasons which apply if the bribe is deemed to have been completed on September 9.
 
 
 22
 But even if it is further assumed that as a matter of state law the bribe was not completed until the check had cleared, the same result should obtain, because as a matter of federal law the bank clearing operations do not constitute a use of interstate facilities as contemplated by § 1952. The specific teaching of Kann v. United States, supra, is that if the interstate mailing is merely collateral to the perpetration of a fraudulent scheme, such mailing is not sufficient to establish a violation of the mail fraud statute. Of course, subsequent decisions, e. g., United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), and Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), recognize that, under the mail fraud statute, use of the mails even after the victim's money has been obtained can be for the purpose of executing the scheme, and thus subject to prosecution, if it is "incidental to an essential part" of the scheme. But on whatever side of the rather vague line drawn by Kann and its progeny the bank clearing in the instant case might fall, an important difference in the mail fraud statute and § 1952 supplies a dispositive answer. The mail fraud statute proscribes conduct where one "knowingly causes" the mail to be used for the purpose of executing the fraud, as well as use of the mail for that purpose. 18 U.S.C.A. § 1341. It was on the ground that each of the defendants "caused" the mail to be used that convictions were upheld in Pereira v. United States, supra, where the basis for prosecution was the deposit of checks. By contrast, § 1952 is limited to "uses [of] any facility in interstate or foreign commerce, including the mail." Therefore, the reasoning used in Pereira to limit the Kann holding is not applicable here.
 
 
 23
 In the expression of my views, little more need be stated. If I am correct in my interpretation of § 1952, the convictions on the substantive counts clearly cannot be supported. And if I am correct in my treatment of the substantive offenses, the conspiracy convictions, under the familiar principle that a conspiracy terminates upon the accomplishment of its unlawful objective, stand on no surer footing. Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L. Ed.2d 931 (1957).
 
 
 24
 I would reverse the judgments and direct the entry of judgments of acquittal.
 
 
 
 Notes:
 
 
 [1]
 18 U.S.C.A
 "§ 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to —
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 (b) As used in this section `unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.
 * * * * *"
 
 
 [2]
 4 Code of Virginia (1960 Repl. Vol.):
 "§ 18.1-278. Bribes to officers or candidates for office. — If any person corruptly give, offer or promise to any executive, legislative or judicial officer, sheriff or police officer, or to any candidate for such office, either before or after he shall have taken his seat, any gift or gratuity, with intent to influence his act, vote, opinion, decision or judgment, on any matter, question, cause or proceeding, which is or may be then pending, or may by law come or be brought before him in his official capacity, he shall, upon conviction, be confined in the penitentiary not less than one nor more than ten years. This section shall also apply to a resident of this State who, while temporarily absent therefrom for that purpose, shall make such gift, offer or promise and thereafter return to this State.
 * * * * *"
 "§ 18.1-279. Acceptance thereof by officer. — If any executive, legislative or judicial officer, sheriff or police officer, or any candidate for such office, accept in this State, or if, being resident in this State, such officer or candidate shall go out of this State and accept and afterwards return to and reside in this State, any gift or gratuity or any promise to make a gift or do any act beneficial to such officer or candidate under an agreement, or with an understanding, that his vote, opinion or judgment shall be given on any particular side of any question, cause or proceeding which is or may be by law brought before him in his official capacity or that in such capacity he shall make any particular nomination or appointment or take or fail to take any particular action or perform any duty required by law, he shall, upon conviction, be confined in the penitentiary not less than one nor more than ten years and shall forfeit his office and be forever incapable of holding any post mentioned in § 2-26. The word candidate as used in this and the preceding section shall mean anyone who offers himself or is put forward by others as a suitable person or an aspirant for such office."
 
 
 [3]
 Of course, the Virginia statute also permits a prosecution based on events which occur earlier than the completed transaction, i. e., the offer to give a bribe, and the agreement to accept one. Ford v. Commonwealth, 177 Va. 889, 15 S.E.2d 50 (1940). For present purposes, however, my concern is properly directed only to the latest point in a complete transaction that criminality attaches
 
 
 [4]
 The "background identification" language inKubacki, quoted in the majority opinion, must be placed in its proper context. It was not held in Kubacki, as the majority holds here, that it is unnecessary in determining whether § 1952 has been violated to examine the specific scope of the state law which the defendant is charged with having the intent to violate when using facilities of interstate commerce. To the contrary, an essential element of the holding in Kubacki is that under Pennsylvania law the crime of extortion is not completed until the actual payment is made, and that this payment was made after September 13, 1961. See 237 F.Supp. at 643 n. 7. The reasoning of the court was that although the public wrong effected by the extortion — the award of a parking meter contract — occurred before the effective date of § 1952, the illicit course of conduct under state law was not completed until the actual payment was made, and that, therefore, the use of facilities of interstate commerce after September 13 was made with the requisite intent to violate state law. Thus, the court stated:
 "Upon the adoption of § 1952 on September 13, 1961, the plan, contemplating as it did use of interstate facilities and interstate travel, became an unlawful conspiracy under federal law. Membership of the defendants in the theretofore federally innocent plan was then converted to membership in an unlawful conspiracy. That conspiracy continued until the accomplishment of the last of its objects, delivery of the money and the clock. Id., 237 F.Supp. at 643. (emphasis supplied)
 The italicized language makes it clear that after the state crime of extortion had been completed by the making of the actual payment, the conspiracy to violate § 1952 must also necessarily terminate. Similarly, United States v. Wingo, (6 Cir. 1967), provides no support for the majority's approach of defining "unlawful activities" as used in § 1952 in federal terms, rather than according to state law. Indeed, in that case, which involved "travel in interstate commerce" to distribute the proceeds of prostitution, the Court explicitly recognized that "we are concerned by the terms of the statute [§ 1952] with an enterprise unlawful under the laws of Tennessee." Id. And although the Court paraphrased the "background identification" language used in Kubacki, the context in which these words are used indicates that the Court meant something far different from what the majority suggests.
 "At this point it becomes necessary to determine what the Travel Act requires in the form of intent. Under § 1952, travel, with a requisite intent plus a subsequent act in furtherance of that intent, would be all that is required to make out a violation. United States v. Bergland, 318 F.2d 159 (7 Cir. 1963) cert. den., Cantrell, et al v. United States, 375 U.S. 861, 84 S.Ct. 129, 11 L.Ed.2d 88 (1963). The state crimes serve only as a background identification of the unlawful activities in aid of which the proscribed travel was undertaken. United States v. Kubacki, 237 F.Supp. 639 (E.D.Pa., 1965). The words `with intent' obviously refer to the words immediately following, namely `to * * * distribute the proceeds of any unlawful activity.'" (emphasis supplied)
 The difference in the "intent" required in Wingo and that required here is explained simply by the fact that the indictments in Wingo were brought under § 1952(a) (1), while the indictments in the instant case were brought under § 1952 (a) (3). For present purposes, the critical aspect of the language in Wingo is that the Court considered that state law provides "background identification" to § 1952(a) (1) only in the sense that the gravamen of the federal offense is the use of interstate facilities with the intent to distribute the proceeds of an unlawful activity, defined by state law.
 
 
 [5]
 As particularized, the indictment charges that the use of interstate facilities by use of the United States mails between the Commonwealth of Virginia and Washington, D. C. occurred on or about September 20, 1961, October 11 and 12, 1961, October 22, 1961, November 28, 1961, and July 17 and 18, 1962
 
 
 [6]
 Indeed, the record shows that Leigh, contemporaneously with drawing his check to Cotten, voided certain previously drawn checks so that the check to Cotten would be paid by the bank when presented